Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,551-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

FREDDY L. WILSON, BRANSON          Plaintiffs-Appellants
WILSON, AND ANTONIA
BURKS

versus

GEICO CASUALTY COMPANY,          Defendants-Appellees
COURTESY CHEVROLET, INC.
D/B/A CHEVYLAND, AND
GENERAL MOTORS, LLC

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Bienville, Louisiana
Trial Court No. 44-350

Honorable Glenn Fallin, Judge

* * * * *

LAW OFFICES OF JACK M. BAILEY, JR.     Counsel for Appellants
By: Jack M. Bailey, Jr.
    Valerie A. DeLatte

COTTON, BOLTON, HOYCHICK, &       Counsel for Appellee
DOUGHTY, LLP                                Courtesy Chevrolet
By: John Hoychick, Jr.                      d/b/a Chevyland

BERNARD, CASSISA, ET AL            Counsel for Appellee
By: Carl J. Giffin, Jr.                        General Motors, LLC

* * * * *

Before MOORE, STEPHENS, and HUNTER, JJ.

**MOORE, C.J.**

The plaintiffs, Freddy Wilson, his son Branson Wilson, and Branson's guest passenger, Antonio Burks, appeal two summary judgments that dismissed their claims of redhibition, negligence, and personal injury against Courtesy Chevrolet Inc., d/b/a Chevyland, arising from a single-car accident involving a 2014 Chevy Camaro purchased from Courtesy. We affirm.

## FACTUAL BACKGROUND

Wilson, who lives in Ringgold, Louisiana, bought the Camaro from Courtesy, on Youree Drive in Shreveport, in December 2015, for the use of his 22-year-old son, Branson. It was a "GM Certified Pre-Owned," meaning the car went through a 172-point inspection and the new owner was entitled to a free oil change and tire rotation. Wilson took the Camaro back to Courtesy in March 2016; they performed the oil change but could not rotate the tires – the rear tires were not the same size as the front. Paperwork showed that in those three months, Wilson and his son had put over 8,000 miles on the car.

Early on the morning of April 30, 2016, Branson was driving back to Ringgold, north on U.S. 371, with his friend Antonio. It had been raining, the road was wet, the area dark, and Branson was using the Camaro's cruise control. Branson suddenly lost control: the car veered left, crossed the southbound lane, went off the road some 102 feet, struck an embankment, flipped over, went airborne some 87 feet, and finally struck a tree and fell to the ground. The car landed on its roof, the wheels pointing up. Branson and Antonio were injured. Branson told State Trooper Michael Antilley, who

came to the scene, that he hit a puddle of water and lost control. Antonio had no recollection of what happened.

A local tow truck operator, Ronald Tipton, towed the Camaro to his lot shortly after the accident. The car stayed there four days; on May 4, Wilson got a friend to move it to his own (Wilson's) property, in Ringgold, where it has remained to this day. Wilson retained counsel; counsel hired an expert, Carl Finocchiaro, P.E., of Spectrum Forensics, in Englewood, Colorado, who examined the car in August 2016, primarily to see if a vehicle recall had anything to do with the accident.

### ACTION IN THE TRIAL COURT

In April 2017, Wilson, Branson, and Antonio filed this suit, in the Second JDC, based on the accident.[1] They named as defendants GEICO, Wilson's auto insurer; Courtesy, the seller; and General Motors ("GM"), the manufacturer. In their petition, Wilson asserted a breach of duty of good-faith adjustment against GEICO and a redhibition claim against Courtesy; all three plaintiffs asserted products liability and personal injury claims against GM; and Branson and Antonio asserted negligence and personal injury claims against Courtesy. The alleged defect was that, as Mr. Finocchiaro discovered several months after the accident, a nut was missing from the tie rod on the driver's side front wheel assembly; this, they alleged, caused the car to veer off the road. The claim against Courtesy was that it allowed the defective Camaro to be sold, and that it negligently performed (or failed to perform) the 172-point inspection; if done right, this would have uncovered the loose or missing nut.

---

[1] In the caption, plaintiffs' counsel misspelled the passenger as *Antonia* Burks.

2

Courtesy filed two exceptions of vagueness, which the district court sustained in part. In response to that judgment, Wilson filed a first amended petition, which not only addressed the ambiguities but specifically alleged a breach of contract and fraud, in that Courtesy never advised him that the Camaro had previously been in an accident.

After considerable discovery, in November 2019, Wilson dismissed his claim against GEICO, reserving all rights against GM and Courtesy. GEICO had declared the Camaro a total loss and paid off the loan, less $4,000, because Wilson wanted to keep the salvage.

*Motions for Summary Judgment*

GM filed a motion for summary judgment in January 2020. This alleged that in his deposition, Mr. Finocchiaro could not identify any specific defect in the Camaro, and had no opinion whether the alleged defect caused the accident or was due to design or manufacture.

Courtesy followed with two motions for summary judgment. The first addressed Branson and Antonio's claims of negligence and personal injury, arguing that there was no evidence that the nut was missing or loose at the time of the sale. It attached a sheaf of documents, including:

● affidavit of Jimmy Sistrunk, the mechanic who performed the 172-point inspection of the Camaro at Courtesy: he stated that the nut was present on the tie rod when he inspected the car, and there was no requirement to place a tool (torque wrench) on the nut to make sure it was really tight.

● affidavit of Jason Rinardo, Courtesy's shop foreman: he stated that a loose nut is noticeable, and would have damaged the steering knuckle and made markings on the tie rod end; however, he looked at the Camaro, parked on Wilson's property, and found no such damage or markings. He also said a loose nut would not cause the car to pull to one side.

● report of James P. Reil, PE, of Engineering Design & Testing Corp., Dallas, Texas, an expert retained by Courtesy: he

3

stated there was no way a loose tie rod could have "persisted" from manufacture until the accident; in his view, somebody intentionally removed the nut *after* the accident.

● affidavit of Ronald Tipton, who towed the car from the scene: when he arrived at the scene, most of the wheel assembly on the Camaro was broken, but the tie rod on the front driver's side was intact.

● affidavit of Trooper Antilley, who worked the accident: he spoke to Branson twice – at the scene, and the next day, at the hospital – and neither time did Branson say anything was wrong with the Camaro, only that he hit some water and lost control.

Courtesy also cited Mr. Finocchiaro's view that the nut was *on* the tie bar when the car left GM, but *off* when he saw it some months after the accident, but he did not know when or how it came off; he merely theorized that the nut was not "adequately tightened."

From all this, Courtesy argued there was no evidence that the nut was missing or loose when the car was sold, nobody could tell when the nut went missing, and, at any rate, the nut had nothing to do with causing the accident.

Courtesy's second motion for summary judgment addressed Wilson's claims of redhibition, breach of contract, and breach of warranty. This incorporated all the attachments and arguments of its first motion, but focused on Wilson's statement in deposition that the only thing wrong with the Camaro was that the "new car factory warranty * * * was not necessarily true." Courtesy also argued that redhibition was impossible because Wilson already got paid for the car: he had bought it for $26,000, financing it through GM Financial, including "gap" coverage; after the accident, GEICO offered him $27,000, which would have left a $4,000 balance; however, Wilson wanted to retain the salvage, so GEICO lowered its offer to $21,000,

which Wilson accepted; later, GM Financial honored its gap coverage and paid the balance. In short, Wilson still owed $4,000 because he kept the wrecked car.

Courtesy also argued that the collateral source rule does not apply when the right of subrogation is involved: without evidence that GEICO's subrogation claim was waived, Wilson was not entitled to recover twice, *Ellis v. Brown*, 50,690 (La. App. 2 Cir. 5/18/16), 196 So. 3d 665. Courtesy attached the joint motion to dismiss GEICO; this recited a reservation of rights against Courtesy and GM, but no waiver of subrogation. It also attached the affidavit of GEICO's attorney, Marshall Pierce, who stated that GEICO did not waive, but retained, its right of subrogation.

Wilson opposed the second MSJ, asserting generally that the "missing or improperly torqued nut caused the failure" of steering and caused the ultimate crash. He also asserted that Courtesy did not properly inspect the car before selling it; committed fraud by representing otherwise; and breached every applicable duty of reasonable care. In support, he attached an NHTSA recall notice, July 2, 2014, affecting 2014 Chevy Camaros because of "improperly torqued fasteners" which may cause the lower control arm and the lower ball joint to separate.

Six months later, Wilson filed a supplemental opposition, attaching the nearly two-hour video deposition of Steve Horn, a Courtesy employee. In this, Horn stated that before the Camaro came to Courtesy, it had been an Avis rental car, and had been in a wreck in Houston, Texas, and repaired. By contrast, Wilson had stated in his deposition that nobody at Courtesy ever mentioned the wreck and repair, or gave him the Carfax report; had he known about it, he would never have bought the car. Wilson also stressed a

5

portion of Mr. Finocchiaro's deposition stating that a loose or missing nut would cause exactly the loss of control that Branson experienced in the Camaro; he dismissed as "unsupported" Courtesy's position that the accident was a result of Branson falling asleep at the wheel.

Courtesy responded, reasserting that Wilson was fully compensated for the Camaro and GEICO had the subrogation rights; hence, there was no redhibition action. Courtesy also showed that Mr. Finocchiaro candidly admitted that he could not testify as to the standard of care applicable to auto mechanics, and did not know when the nut came off. Finally, Courtesy argued that affiants and depositions are deemed to be credible, but Wilson was contending that they were not.

### ACTION OF THE DISTRICT COURT

The matter came for a hearing on all three motions for summary judgment in May 2021. When the court convened, GM's counsel announced that the plaintiffs would withdraw their opposition to GM's motion. Plaintiffs' counsel confirmed: "I do not believe that I can tell the court that there's a viable cause of action on any basis against" GM.

After hearing argument, the district court found that even though Wilson still owed $4,000 to GM Financial, he got to keep the wrecked car, so he was already made whole; hence, there was no redhibition claim.

After further argument, the court expressed doubt that the technician performing the 172-point inspection must both visually inspect the tie rod nut *and then* put it under a torque wrench to make sure it is on really tight. The court ruled that there was no genuine issue regarding negligence and personal injury. The court granted both summary judgments and rendered judgment dismissing all claims.

6

Wilson, Branson, and Antonio (hereinafter collectively referred to as "Wilson") appealed.

## APPLICABLE LAW

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief sought by a litigant. *Murphy v. Savannah*, 18-0991 (La. 5/8/19), 282 So. 3d 1034. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of civil actions (except for certain domestic matters) and is favored by our law. La. C.C.P. art. 966 A(2). A court must grant a motion for summary judgment if, after an opportunity for adequate discovery, the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 A(3); *Murphy v. Savannah*, *supra*.

A defendant moving for summary judgment has the burden of pointing out to the court that there is an absence of factual support for one or more elements essential to the plaintiff's claim. Thereafter, if the plaintiff fails to produce factual support to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966 D(1); *Johnson v. Purpera*, 20-01175 (La. 5/13/21), 320 So. 3d 374. Mere speculation is not sufficient to create a genuine issue as to an essential element of the plaintiff's case and defeat a properly supported motion for summary judgment. *Gifford v. Arrington*, 14-2058 (La. 11/26/14), 153 So. 3d 999; *Mansoor v. Jazz Casino Co.*, 12-1546 (La. 9/21/12), 98 So. 3d 795; *Watts v. Party Central Family Fun Ctr.*, 54,171 (La. App. 2 Cir. 1/12/22), 332 So. 3d 1279, *writ denied*, 22-00279 (La.

7

4/12/22), 336 So. 3d 81. The question whether a legal duty is owed may be properly resolved by summary judgment. *Allen v. Lockwood*, 14-1724 (La. 2/13/15), 156 So. 3d 650; *Bufkin v. Felipe's La. LLC*, 14-0288 (La. 10/15/14), 171 So. 3d 851; *Watts v. Party Central Family Fun Ctr.*, *supra*.

Appellate review of a summary judgment is de novo, with the appellate court using the same criteria that governed the trial court's determination, i.e., whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. *Murphy v. Savannah*, *supra*; *Watts v. Party Central Family Fun Ctr.*, *supra*. Whether a particular fact in dispute is "material" for summary judgment purposes is viewed in light of the substantive law applicable to the case. *MB Indus. LLC v. CNA Ins. Co.*, 11-0303 (La. 10/25/11), 74 So. 3d 1173; *Putman v. Costello*, 53,142 (La. App. 2 Cir. 11/20/19), 284 So. 3d 1225.

Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it, had he known of the vice. La. C.C. art. 2520; *Modicue v. Prince of Peace Auto Sale LLC*, 54,095 (La. App. 2 Cir. 9/22/21), 328 So. 3d 1239, *writ denied*, 21-01864 (La. 2/15/22), 332 So. 3d 1188. The buyer must prove that the vice existed before the sale was made by him; however, if the vice appears within three days immediately following the sale, it is presumed to have existed before the sale. La. C.C. art. 2530; *Holloway v. Gulf Motors Inc.*, 588 So. 2d 1322 (La. App. 2 Cir. 1991).

A buyer who obtains rescission because of a redhibitory defect is bound to return the thing to the seller, for which purpose he must take care

8

of the thing as a prudent administrator, but is not bound to deliver it back until all his claims, or judgments, arising from the defect are satisfied. La. C.C. art. 2532; *Gandhi v. Sonal Furniture & Custom Draperies LLC*, 49,959 (La. App. 2 Cir. 7/15/15), 192 So. 3d 783, *writ denied*, 15-1547 (La. 10/23/15), 184 So. 3d 19. The buyer bringing an action in redhibition is obligated to tender the object which he alleges to be defective or give a reasonable excuse for his failure to do so. *Edmundson Bros. v. F.M. Carriere & Son Inc.*, 552 So. 2d 1229 (La. App. 3 Cir. 1989), *writ denied*, 558 So. 2d 587 (1990); *Starwood v. Taylor*, 434 So. 2d 1236 (La. App. 1 Cir. 1983). The collateral source rule does not apply where the right of subrogation is involved; in such a case, the plaintiff may recover only his remaining interest in the partially subrogated claim. *Ellis v. Brown*, *supra*, and citations therein.

Consent may be vitiated by error, fraud, or duress. La. C.C. art. 1948. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or disadvantage to the other. La. C.C. art. 1953. In order to rescind a contract for fraud, the plaintiff must prove (1) a misrepresentation by the defendant; (2) an intent to obtain an unjust advantage; (3) that the misrepresentation related to a circumstance significantly influencing the victim's consent; and (4) a relation of confidence. *Henderson v. Windrush Oper. Co.*, 47,659 (La. App. 2 Cir. 8/21/13), 128 So. 3d 283, *writ denied*, 13-2502 (La. 2/14/14), 132 So. 3d 411.

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315 A. Louisiana courts have adopted a duty-risk analysis in determining whether liability

9

exists under the facts of a given case. Under this analysis, the plaintiff must prove (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to that standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Bufkin v. Felipe's La.*, *supra*; *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La. 4/3/02), 816 So. 2d 270; *Watts v. Party Central Family Fun Ctr.*, *supra*.

**DISCUSSION**

***Genuine Issues Regarding Inspection and Certification***

By his first assignment of error, Wilson urges the court erred in granting summary judgment when genuine issues of material fact exist as to if a proper inspection of the Camaro was performed prior to "certification" and sale to Wilson. He contends the inspection was deficient because there was no test drive by anyone at Courtesy and because no manager signed the inspection form. He concedes that Courtesy's records show the car was driven a few miles, but asserts that this is simply not enough to constitute a true test drive. He also concedes that the service manager, Sistrunk, stated he performed a full inspection, but argues that a reasonable person could find that Sistrunk's "testimony is unreliable." He contends that Courtesy "passed up" a second opportunity to discover the defect, when Wilson brought the car back for an oil change in March 2016; on that occasion, Wilson told them the car was pulling to the left, but Courtesy personnel replied that this would require an alignment, which was not part of the warranty, and that the tires were extremely worn, and these were also not

10

under warranty. He suggests that the worn tires contributed to the wreck. Finally, he urges that nobody at Courtesy told him about the "previous front end wreck" or gave him the Carfax report, which would have disclosed this. He asserts that that accident affected the "driver's side tire steering and suspension systems," contributing to the accident in this suit. He concludes that all these discrepancies precluded the grant of summary judgment.

The defendant moving for summary judgment must first point out to the court the absence of factual support for one or more elements essential to the plaintiff's claim. La. C.C.P. art. 966 D(1). To defeat the motion, the plaintiff must produce factual support that he will be able to satisfy his evidentiary burden at trial. *Id.* We have therefore examined the summary judgment evidence, de novo, to see if it creates any genuine issues.

The 172-Point Inspection certificate showed a mileage of 28,999; the customer acknowledgment form showed a mileage of 29,001; this suggests the car was driven about two miles while at Courtesy. Sistrunk, the mechanic who performed the inspection, stated by affidavit that he took the car on a test drive. Branson testified by deposition that before they bought the car, *he* took it on a test drive, with the salesman in the car, from Courtesy's lot down to the Circle K, about two miles each way; somehow, those four miles are not reflected on the customer acknowledgment form. However, the evidence shows that Courtesy drove the car about two miles, and Branson about four. There is no record evidence, expert or lay, that these excursions were inadequate for a test drive. We perceive no genuine issue of material fact.

Sistrunk's affidavit stated that he worked as an auto mechanic for 39 years, he regularly performed 172-point inspections, he performed the

11

inspection on this Camaro, and he would have seen if the nut was loose on the tie rod stud or tie rod end; and he did not see this. Further, when he test-drove the car, if the nut had been loose, he would have detected this in the feel of the drive and the noise of the tie rod; he detected nothing like this. Finally, the work he performed to make the car pass inspection, changing the rear brake pads and refinishing the rotors, did not require him to remove the nut on the front driver's side tie rod. There is no record evidence to contradict any of this. Mere speculation is not enough to defeat a properly supported motion for summary judgment. *Gifford v. Arrington*, *supra*. The suggestion that a jury might disbelieve the defendant's witness is not evidence. *Babin v. Winn-Dixie La.*, 00-0078 (La. 6/30/00), 764 So. 2d 37; *In re Succession of Byrd*, 48,996 (La. App. 2 Cir. 6/11/14), 142 So. 3d 1058. The court must assume that all affiants are credible. *Succession of Moore*, 54,338 (La. App. 2 Cir. 3/30/22), __ So. 3d __; *Joliboix v. Cajun Comfort Inc.*, 16-414 (La. App. 3 Cir. 12/7/16), 207 So. 3d 655. We perceive no genuine issue of material fact.

The absence of the manager's signature on the 172-point inspection form is more concerning. Wilson made clear that the inspection was a major selling point for the car; Courtesy's suggestion that the manager's signature was merely a contractual matter between the dealership and GM is without factual support and seems to miss the point. However, aside from the mere allegation, there is no evidence that the manager double checks or performs a second inspection after the mechanic, or that the unexplained omission of the manager's signature casts any doubt on the adequacy or reliability of the inspection. Viewing this record de novo, we find no genuine issue of material fact.

12

Wilson stated in deposition that nobody at Courtesy ever gave him the Carfax report for this car; he argues in brief that this would have disclosed the prior accident, which affected the same area of the Camaro that later failed, causing this accident. However, Branson testified that *he* got the Carfax report. Mr. Reil, Courtesy's expert engineer, examined these records and testified that when the Camaro was owned by Avis, it was in an accident in September 2014, in Houston; the crash data retrieval system showed that it was going only 12 mph and the airbags did not deploy. Repairs included a new front license plate panel, a bumper absorber, a lower grille, front end cover and panel brackets, one light bulb, and paint, costing $826. Courtesy's shop manager, Jason Rinardo, stated by affidavit that this damage had no effect on the nut holding the tie rod to the steering assembly and tire. There is no evidence that the minor accident in Houston did anything to the tie rod nut or created any defect. We perceive no genuine issue of material fact.

Finally, Wilson contends that Courtesy missed a second opportunity to uncover the defect, when he brought the car back for a scheduled oil change in March 2016. He testified that three or four weeks before this, he noticed that the car would pull or veer slightly to the left when driven at slower speeds, up to about 45 mph; at 60 mph, it did not happen. When he brought the car in for the oil change, he reported this, and the service manager replied it was probably due for a tire rotation; when he picked up the car, the service manager said, "It's ready to go." However, Wilson said the car was still having the problem, and sometime later he told his salesman about it. The salesman replied that he probably needed an alignment, but Wilson admitted he did not ask for the alignment.

13

Steve Horn, the Courtesy representative who certified all Courtesy's records involving the Camaro, stated by affidavit that the tires could not be rotated because the rear tires were larger than the front ones (the work order stated "No Rotation"), and there was no evidence that Wilson asked for an alignment. He added that Sistrunk, who performed the inspection and changed the oil, never hesitated to make work orders or perform repairs when so requested.

In short, the summary judgment evidence does not support the claim that the initial inspection or the scheduled maintenance was inadequate or fraudulent. This assignment of error lacks merit.

### *Genuine Issues Regarding Cause of Accident*

By his second assignment of error, Wilson urges the court erred in granting summary judgment when the experts offered competing opinions as to the cause of the crash and the defective condition of the Camaro. He concedes where his expert, Mr. Finocchiaro, and Courtesy's, Mr. Reil, agreed: the tie rod separated from the steering knuckle on the front driver's side, because the nut was missing; and the nut had separated from the rod without damaging the ball stem, so it did not pop off as a result of the collision. However, he argues that Mr. Finocchiaro testified that the nut came off close in time before the crash, and the separation of the tie rod from the steering knuckle caused the car to leave the roadway. In Wilson's view, Mr. Finocchiaro concluded that the loss of the nut initiated the accident. Wilson concludes that with this expert opinion, the court could not have found no genuine issue of material fact.

We have closely read Mr. Finocchiaro's deposition and find that his factual observations do not support the "conclusion" that the nut came off

14

shortly before the accident. He stated that the nut was in place when the car left GM, and missing when he examined it on Wilson's property in August 2016. Otherwise, he had no information whether the nut was adequately (or inadequately) tightened: "I can't describe how that came to be." He testified that had the nut come loose, it would have left evidence in the form of "chatter" in the steering knuckle, but he found no such "chatter." He also testified when the nut is properly attached, it can be removed only by significant pressure from a torque wrench; he had no information whether someone came to the site and removed the nut after the accident. Finally, he admitted that he performed no accident reconstruction. In short, he cited no *factual support* for his theory that the nut came loose shortly before the accident, and he conceded many facts that would refute that theory.

The parts of Mr. Finocchiaro's deposition that refute the conclusion are supported by other evidence. Courtesy's shop foreman, Rinardo, stated by affidavit that he inspected the Camaro, on Wilson's property, and found that the tie rod was bent, and the stud threads were free of markings or deformity; neither of these would be the case if the nut had come off before the accident. Courtesy's expert engineer, Mr. Reil, testified that when he examined the Camaro, the front wheel assembly was still attached, but this would not be the case if the tie rod had separated from the steering knuckle pre-impact. He also testified that if the nut had been loose, it would have come off well before 3½ years and 37,000 miles. He concluded that the most likely explanation for the missing nut was "human intent." Finally, the tow truck driver, Tipton, stated by deposition that when he arrived at the scene of the accident, the Camaro was lying wheels-up; before he attached it to his truck, "the tie rod on the front driver's side was still holding the wheel

15

onto the vehicle." Nothing in Mr. Finocchiaro's deposition disputes any of these findings.

The expert's interesting – yet unsupported – opinion simply does not show that Wilson would be able to offer any evidence creating a genuine issue of material fact.

This court also recognizes that aside from speculation about the tie rod nut, there was ample evidence of other causes of the accident. Mr. Reil measured the tire treads at between 1/32 inch (left rear) and 5/32 inch (left front), very close to the level (2/32 inch) where replacement is advised; Tipton, the tow truck driver, confirmed that the tires were "slick and not in good shape." The summary judgment evidence shows that the accident occurred on a slick road after rain. Trooper Antilley stated in deposition that both at the scene and the next day, in the hospital, Branson told him that water in the roadway caused him to slide off the road; in his own deposition, Branson admitted that he may have said this to the trooper. According to Antilley, Branson never ascribed the accident to any mechanical problems.

On this large record, the expert's hypothesis regarding when the tie rod nut came loose is not supported and does not create a genuine issue of material fact. This assignment of error lacks merit.

### Genuine Issues Regarding Redhibition

By his third assignment of error, Wilson urges the court erred in granting summary judgment when genuine issues of material fact exist as to redhibition. He asserts that he is still $4,000 in debt to GM Financial, so he has not been made whole. He shows that a bad-faith seller is liable for return of the purchase price, reasonable expenses, damages, and attorney fees, La. C.C. art. 2545, and argues that because it failed to disclose all the

16

problems with the Camaro, Courtesy is a bad-faith seller. He also shows

that the buyer need not show the precise cause of the defect, but merely the

existence of the defect, to prevail in redhibition, *Wilks v. Ramsey Auto*

*Brokers*, 48,738 (La. App. 2 Cir. 1/15/14), 132 So. 3d 1009. He concedes

that when he settled with GEICO, he owed $25,302.72 on the car, GEICO

paid the creditor $21,524, and he (Wilson) was allowed to keep the salvage,

but he argues this was "required" due to the ongoing litigation, so he should

have a redhibition claim for the balance.

Although this record is unusually long, the summary judgment

evidence regarding redhibition is straightforward. When he dismissed his

claim against GM, Wilson conceded that the Camaro had no defects when it

left GM. The 172-point inspection checklist shows that suspension system

and gear/rack and pinion were inspected and passed; Sistrunk, the mechanic

who performed the inspection, stated by affidavit that the tie rod nut was in

place when he saw it; had it been missing or loose, he would have noticed it.

Mr. Finocchiaro, Wilson's expert, expressly declined to state an opinion as

to the duty of care of a mechanic performing such an inspection, or that

Sistrunk's conduct was substandard. The only irregularity in the inspection

is that the checklist, signed by Sistrunk, was not also signed by a manager;

however, there is no summary judgment evidence to show that this affected

the validity of the inspection. In short, there is no summary judgment

evidence that the nut was loose or missing when the car left Courtesy and,

hence, no genuine issue as to that essential element of a redhibition claim

under Art. 2530.

Wilson correctly shows that he is still about $4,000 in debt for the car.

However, the summary judgment evidence shows that Wilson released his

17

insurer, GEICO, with a reservation of rights against GM and Courtesy. The affidavit of GEICO's lawyer, Mr. Pearce, stated that GEICO did not waive subrogation; Wilson offered no summary judgment evidence to contradict this. On this showing, the collateral source rule does not apply, and Wilson has no redhibition claim. *Ellis v. Brown*, *supra*. There is no genuine issue of material fact that Wilson has been fully compensated for the car, by insurance proceeds and retention of salvage.

This assignment of error lacks merit.

### *Other Alleged Errors*

Although Wilson did not formally designate this as an assignment of error, he argues in brief that the court erred in dismissing Courtesy when the plaintiffs' claims for fraud and breach of contract were never before the court. He contends that in February 2018, he received leave of court to amend his petition, and did so to add claims of fraud and breach of contract. He argues that these claims were not addressed by either of Courtesy's motions for summary judgment, so even if the court's ruling was correct, it was overbroad for failing to consider these claims.

This court and others have recognized that redhibition and breach of contract are distinct claims: they have different prescriptive periods, and judgment rejecting one is not res judicata as to the other. *Cameron v. Bruce*, 47,463 (La. App. 2 Cir. 9/26/12), 106 So. 3d 587, *writ denied*, 12-2346 (La. 12/14/12), 104 So. 3d 446; *Davidson v. Sanders*, 18-308 (La. App. 3 Cir. 12/6/18), 261 So. 3d 889; *Berman Daferner Inc. v. Causey*, 97-1647 (La. App. 1 Cir. 9/25/98), 723 So. 2d 467.

Wilson correctly shows that, in response to two exceptions of vagueness, he filed a first amended petition on February 9, 2018, alleging

breach of contract and fraud against Courtesy. However, Courtesy's motion for summary judgment, filed over 18 months later, specifically referred to Wilson's claim "that there is a breach of contract" and that he "was not informed of those defects." In short, both issues were properly before the district court when it ruled on the motions. Wilson's argument to the contrary lacks merit.

On the merits, this record does not show enough evidence to create a genuine issue whether Courtesy misrepresented the condition of the Camaro or whether the absence of the manager's signature invalidated the 172-point inspection. And, for the reasons already discussed, the evidence does not create a genuine issue whether any defect was present at the time of the sale. Judgment was proper, as a matter of law, dismissing the claims of fraud and breach of contract.

## CONCLUSION

For the reasons discussed, the judgments granting the motions for summary judgment are affirmed. All costs are to be paid by the appellants, Freddy Wilson, Branson Wilson, and Antonio Burks.

**AFFIRMED**.

19